Filed 5/22/25  P. v. Bieser CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEFANIE LYN BIESER,<br><br>    Defendant and Appellant. | G062491<br><br>(Super. Ct. No. 19NF0632)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick H. Donahue, Judge. Reversed and remanded.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Kathryn Kirschbaum and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

1

Stefanie Lyn Bieser appeals from the judgment entered after a jury found her guilty of second degree implied malice murder. Bieser asserts several arguments on appeal, including that the trial court erred by overruling her objection, under Code of Civil Procedure section 231.7 (section 231.7), to the prosecutor's exercise of a peremptory challenge to a prospective juror.

For the reasons we explain, we conclude the trial court erred in overruling Bieser's objection under section 231.7. Accordingly, and pursuant to section 231.7, subdivision (j), we must reverse the judgment of conviction and remand the matter for a new trial. We therefore do not reach Bieser's other contentions of trial error.

FACTS

After drinking with family and friends before and during a concert at the House of Blues in the City of Anaheim, Bieser got into her car to drive home. After she drove her car out of a parking structure, she failed to properly navigate a turn and the car struck the street's center divider. Instead of slowing down, the car accelerated, crossed lanes of traffic, jumped the curb on the side of the street, hit utility infrastructure, and struck and killed Louis Rosales, who had been walking with his family on the sidewalk. The car then came to rest against a tree on the other side of the sidewalk.

A police officer who responded to the incident observed Bieser smelled strongly of the odor of alcoholic beverage and was unsteady as she walked. The officer also observed Bieser's eyes were watery and glassy. The officer performed one field sobriety test before Bieser refused to participate in any others. During the test, Bieser displayed a wide range of emotions and behavior; her speech was sometimes slurred and almost incoherent.

A test of a sample of Bieser's blood, drawn pursuant to a warrant roughly five hours after the collision, indicated a blood alcohol concentration of between 0.188 and 0.191 percent. An Orange County crime lab director opined that at the time of the collision, Bieser's blood alcohol concentration may have been between 0.25 and 0.26 percent.

Twenty-eight years before the incident, Bieser pled guilty to driving under the influence (DUI).

## PROCEDURAL HISTORY

Bieser was charged in an information with murder in violation of Penal Code section 187, subdivision (a). The jury found Bieser guilty of second degree murder. The trial court sentenced Bieser to a prison term of 15 years to life. Bieser filed a timely notice of appeal.

## DISCUSSION

### I.

### THE LEGISLATURE OVERHAULS THE LEGAL FRAMEWORK FOR ELIMINATING RACIAL DISCRIMINATION IN JURY SELECTION BY ENACTING SECTION 231.7

"The use of peremptory challenges to strike prospective jurors because of their race is prohibited by our state and federal Constitutions. (*Batson v. Kentucky* (1986) 476 U.S. 79, 88 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*), overruled on other grounds in *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*); see also *Georgia v. McCollum* (1992) 505 U.S. 42, 59 [use of race in the exercise of peremptory challenges is constitutionally prohibited for both the prosecution and the defense].)" (*People v. Hinojos* (2025) 110 Cal.App.5th 524, 539–540 (*Hinojos*).)

Under what is commonly referred to as a *Batson*/*Wheeler* analysis, "[t]o evaluate a party's constitutional objection to an opposing party's exercise of a peremptory challenge purportedly based on race, trial

3

courts engage in a three-step procedure: first, the objecting party must make out a prima facie case "'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose'"; second, if the objecting party makes a prima facie showing, the "'burden shifts'" to the party seeking to exercise the peremptory challenge "'to explain adequately the racial exclusion'" by offering permissible race-neutral justifications for the strikes; and third, if the party offers a race-neutral explanation, the trial court then decides whether the objecting party has proven purposeful discrimination." (*Hinojos, supra*, 110 Cal.App.5th at p. 540.)

"Having found the *Batson/Wheeler* procedure ineffective in eliminating the discriminatory exclusion of potential jurors, the Legislature passed Assembly Bill No. 3070 (2019–2020 Reg. Sess.), effective January 1, 2021. [Citation.] The law added section 231.7, which sets forth a different set of procedures for addressing statutory objections to peremptory challenges.

"Under these procedures, as pertinent here, '[a] party . . . may object to the improper use of a peremptory challenge' based on a 'prospective juror's race' or 'perceived' race. (§ 231.7, subds. (a) & (b).) In contrast to the three-step *Batson/Wheeler* procedure, under section 231.7, there is no requirement that the objecting party first make a showing of purposeful discrimination. [Citation.] Rather, 'upon objection . . . , the party exercising the peremptory challenge *shall* state the reasons the peremptory challenge has been exercised.' (§ 231.7, subd. (c), italics added.) The trial court 'shall evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances.' (*Id.*, subd. (d)(1).). . . .

"Unlike in the *Batson/Wheeler* analysis, the ultimate question for the trial court is not whether the party exercising the peremptory challenge engaged in 'purposeful discrimination.' [Citation.] Instead, the trial court

4

shall sustain the objection to the use of the peremptory challenge '[i]f the court determines there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge.' (§ 231.7, subd. (d)(1).)" (*Hinojos, supra,* 110 Cal.App.5th at pp. 540–541, fns. omitted.)

## II.

### SUMMARY OF RELEVANT VOIR DIRE PROCEEDINGS LEADING TO THE TRIAL COURT OVERRULING BIESER'S SECTION 231.7 OBJECTION

*A. Voir Dire of Prospective Juror No. 170*

In response to the court's initial set of general questions, Prospective Juror No. 170 (PJ No. 170) stated he has worked as a behavior analyst for children with autism between the ages of three and 21 years, and has worked in that field since 2015. He elaborated that his work, which is through a private agency, addresses suitability, "social functional communication skills," social skills, and self-help skills. He also stated he works to "decrease[] adaptive behaviors, physical correction, self-behavior, property destruction, repetitive behaviors, and other behaviors that could be disruptive or safety concerns." The court asked PJ No. 170 if he thought he could be fair in this matter and PJ No. 170 responded, "Yes, sir."

1. Defense counsel's inquiry of PJ No. 170

During voir dire, defense counsel asked PJ No. 170 whether he drinks; PJ No. 170 answered, "Yes." Defense counsel then said, "I am not going to ask you if you have ever been drunk because I feel like—" before PJ No. 170 stated, "I might have, yes. Yes."

Defense counsel then responded, "Honest jurors. That's great," before continuing to question PJ No. 170 as follows:

5

"[Defense counsel]: *In this case[,] the sole focus will be murder.* Is that something that you will be able to evaluate?

"[PJ No.] 170: Yes, ma'am.

"[Defense counsel]: Okay. And hearing the circumstances of the murder case, what did you think when you heard drunk driving? Someone got -- someone was killed?

"[PJ No.] 170: *It doesn't necessarily equate to murder, but it just depends on what evidence is brought forward to us.*

"[Defense counsel]: And you will be able to listen and evaluate that?

"[PJ No.] 170: Yes, ma'am.

"[Defense counsel]: Okay. And knowing that someone has passed -- and you are going to hear that, and it is going to be very traumatizing and very impactful. Do you still think that you will be able to evaluate the law without any bias and just with the evaluation of the facts but knowing that?

"[PJ No.] 170: Yes, ma'am.

"[Defense counsel]: Okay. What makes you think that?

"[PJ No.] 170: Just whatever evidence is presented to us.

"[Defense counsel]: But you as a person, what makes you think that you will be able to be fair and evaluate that?

"[PJ No.] 170: So with my current occupation and a lot of practice, a lot of what I do is based on what's observable and measurable and not mentalistic. So I would apply the similar approach to that to this.

"[Defense counsel]: Okay. And are you -- let's say that you were in the back and you were deliberating with the others and you had an opinion. Are you going to be -- and your opinion is different from the others. Are you

6

able to discuss with your other jurors the differences of an opinion but still, if you think that you are right, you would be able to stay with your position?

"[PJ No.] 170: I mean, I would hope it would be -- my opinion would be based on the facts, yes.

"[Defense counsel]: And you would still be able to?

"[PJ No.] 170: Not just how I feel.

"[Defense counsel]: Okay. And then you would be able to deliberate with our other jurors?

"[PJ No.] 170: Yes, ma'am." (Italics added.)

2.  The prosecutor's inquiry of PJ No. 170

The following day when it was the prosecutor's turn to inquire of the prospective jurors, the prosecutor's beginning statements included the following:

"Now, yesterday and today I heard this word. Murder. Murder. This is a murder. That's a murder. It would have to be this. Would all of you agree that the title of a crime is irrelevant? What meaning should that really have to you here? What something is called.
"Would you all agree that what's important is listening to the evidence, looking at any evidence that's presented, and first determining what happened? Does everyone agree to that job?

"It is like you all have black robes on. The judge is the judge of the rulings here. And if there were to be a guilty verdict, he would do sentencing. You are the judges of the facts. So that's the first job.

"Second job is once you decide what happened, you apply it to the elements of the crime. And [it] either meets the elements or it doesn't; right?

"So I'd like to say that in cases like this where there is a legal theory that you might not be familiar with -- because I heard a lot of people

7

yesterday say things about murder. Like I heard [PJ No.] 170, I think, talk about, 'well, that might not equate to murder.'

"And what does that mean? Like, murder is a term that we have in our heads from whatever personal experience you have had; right? What you have seen on TV, what you learned in law school. It is the title isn't what you are looking at.

"Can you set aside maybe a preconceived notion you have about what might equate to murder and just listen to the facts and apply it to the law?"

PJ No. 170 responded to the prosecutor's question, stating: "Yes, ma'am."

After asking several other prospective juror questions, the prosecutor further questioned PJ No. 170 as follows:

"[Prosecutor]: . . . You talked about you would, in this job, use observable evidence like you do in your work.

"[PJ No.] 170: I would look at the evidence as possible -- as factual as possible.

"[Prosecutor]: Okay. And I know from what I heard yesterday that a lot of what you do is you -- when you work with them, you are seeing what they are doing and then maybe saying, 'okay. This is this type of issue. I am going to work with them to have a better social skill this way.'

"So you are observing personally?

"[PJ No.] 170: Uh-huh.

"[Prosecutor]: Would you agree that you are taking circumstantial evidence of direct observation, and then things that you know from your experience and other circumstances to make a decision as to how to proceed with that student?

"[PJ No.] 170: Well, so it is a lot of what we do is based on, you know, research in the past regarding our procedures.

"So, yeah. Essentially, I observe the behavior. I observe what happened before, what happened after. And based on my experience and my training and my education, I make changes to whatever behavior intervention plan we have to increase behavior or decrease behavior, whatever that is. So it is a little bit different.

"[Prosecutor]: So that perfectly coincides with witnesses we may have.

"So, for instance, would you agree that an everyday person who doesn't have specialized training but has experience with something could develop a level of expertise?

"[PJ No.] 170: Yes.

"[Prosecutor]: They don't have to have a degree in something because they have done it so many times?

"[PJ No.] 170: Yes.

"[Prosecutor]: Would you also agree that there are -- for instance, like a police officer. You wouldn't just think, 'oh, everything they say is true.' But if they have specialized experience in something, you would consider that in their testimony?

"[PJ No.] 170: Potentially.

"[Prosecutor]: Potentially?

"[PJ No.] 170: Potentially.

"[Prosecutor]: Why would you not consider it, the experience they have?

"[PJ No.] 170: Well, their experience is one thing, but their perception of the event that's took place is another.

9

"[Prosecutor]: Well, you understand that most times police officers aren't witnessing a crime happen; right?

"[PJ No.] 170: Right.

"[Prosecutor]: They come and they take reports, and we are going to talk to them about those type of things; right?

"[PJ No.] 170: Yes.

"[Prosecutor]: So when we are looking at an officer testifying about a topic, if they have experience in that topic, are you going to consider that experience?

"[PJ No.] 170: Yes."

*B. Bieser Objects Under Section 231.7 to the Prosecutor's Exercise of a Peremptory Challenge to Excuse PJ No. 170*

The prosecutor later exercised a peremptory challenge to excuse PJ No. 170. After defense counsel stated she objected pursuant to section 231.7, subdivision (b), the trial court held proceedings in chambers with counsel and outside the presence of the prospective jurors.

The trial court asked defense counsel the basis for her objection. Defense counsel stated: "He is part of a protected class. And there was nothing that I saw, other than, you know -- I didn't see anything that would make him not a fair, impartial juror." The prosecutor asked what protected class PJ No. 170 belonged to and defense counsel responded, "He is Latino." The prosecutor stated she was unaware of that fact as she "didn't know that just by looking at him" and she did not have his name.

The prosecutor then stated: "My concern and the reason I am kicking him is because he is a behavior analyst. He talked about yesterday doing the job and looking at things not observable to others that might be in the evidence. [¶] And then when I talked to him today about whether he

10

would consider the experience of a police officer, he was hesitant to do that. And talked about how he -- 'well, I don't know if I would agree with that, with his perceptions.' [¶] Then when I talked to him further, I forced him into saying he would look at it. But it causes me concern as to how he will evaluate police officer testimony in this case, especially using his behavior analysis skills that he does in his work."

The prosecutor clarified her peremptory challenge was not based on law enforcement or any type of witness, but on whether PJ No. 170 would consider a witness's experience given "he hesitated and said he wouldn't. And then he said, 'well, maybe I will. I would look at it.'" The prosecutor added: "And he does behavior analysis, and he talked yesterday about observable characteristics that might or might not be in evidence. So it doesn't have anything to do with the type of witness."

Defense counsel argued PJ No. 170 said he could evaluate the evidence and further argued the prosecutor conducted only a cursory questioning of PJ No. 170 on the subject.

After the trial court asked the prosecutor to again state her reasons for the peremptory challenge of PJ No. 170, the prosecutor stated: "He told us he is a behavior analyst. . . . [¶] And I am concerned about him using that training and experience in this work and trying to infer things. So when I talked to him and yesterday, he said, 'I would look at observable things that are not in evidence.' [¶] And that's the quote I have.[1] I didn't understand what he was saying. So then I asked him. I used a law enforcement officer as the example, but it pertains to any type of witness. It

---

[1] This statement attributed to PJ No. 170 by the prosecutor is not in our record.

11

has nothing to do with distrust of law enforcement because we didn't discuss that at all. [¶] I asked him if he would take into account training or experience, and he was hesitant to do that. And he said, '[W]ell, I would have to look at their perceptions,' and I didn't -- I said, '[B]ut would you take into account their training?' [¶] 'Well, yes, I would.' He didn't seem like he wanted to. [¶] So I look at him as someone who is not going to be taking into account different witnesses' training and experience, and he is going to be using his job to analyze their behavior to assess the testimony instead of what the law says that he should be considering."

Defense counsel reiterated PJ No. 170 said he would take training and experience into consideration, and so "that's a done issue." Defense counsel's argument continued: "Then as to his job as a -- to behavioral analysis where she is thinking that he is going to use that in his work as a juror. She didn't question this juror as to that subject at all. And that's part of the requirements for [section] 231.7[, subdivision] (d)(3)(C)(i). [¶] And, if anything, she did a cursory questioning of him as to the training, but that -- whether he would consider training and experience, but he said he wouldn't. [¶] So those are my reasons. And he is part of a protected class. His name is Zamora. Last name is Zamora. And he said he could be fair."

The prosecutor rebutted: "[I]f the court doesn't feel like it has enough information, I would request that we read back his answers. Because he gave a long-winded answer about what he does in his job and said, '[S]o it is different.' [¶] And so in my communications with him, I didn't feel that he was going to follow the law about how to evaluate expert testimony or experience that witnesses have. He was going to be using how he does his job and how he evaluates what he is going to do and looking at behaviors. Not what I am talking about is if someone has training, experience, et cetera."

12

*C. The Trial Court Overrules Bieser's Section 231.7 Objection*

After confirming both the prosecutor and defense counsel submitted on the issue, the trial court acknowledged Bieser's objection fell within section 231.7, which had been enacted earlier that year. The court observed this was the third peremptory challenge exercised by a party to excuse a Hispanic prospective juror (the parties and the court agreed PJ No. 170 was Hispanic).[2] As pointed out by the parties, the prior two challenges were for cause due to one prospective juror's personal experience with an unrelated DUI matter and the other having a school conflict. The court explained, however: "If we are sitting here five hours from now and all the Hispanics are being kicked off, I suppose I would probably be more prone to say, yeah, there is a substantial likelihood that it is because of race or ethnicity."

The trial court's explanation of its analysis of Bieser's section 231.7 objection continued: "[PJ No. 170] did hesitate this morning where he said where -- and this is a case that involves expert opinions involving DUI. And when the question was asked, 'how would you regard training and experience,' he did hesitate and kind of hemmed and hawed about it until I think you asked him another question where he said, '[W]ell, I guess I could

---

[2] We use the term "Hispanic" in this opinion because that is the term used most often in the trial court during voir dire, although the parties sometimes used the term "Latino" interchangeably. For the same reason, we use the term "[W]hite," although in one instance the term "Anglo" was used interchangeably.

13

do it.' [¶] But there was kind of a long-winded answer about, you know, 'I don't know if I would be able to do that or whether if I would do that or not.'"

The trial court stated: "When I look at all the questions that were posed, and the reason for the exclusion, the challenge, the court does not believe that there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation" as a factor in the use of the peremptory challenge of PJ No. 170. The court added: "And the court is considering that because of the questioning and the fact that that one question was where he hesitated about the training and experience."

After the trial court and the parties noted the victim, members of the victim's family who witnessed the incident, and Bieser's partner, who were potential witnesses at trial, are all Hispanic and that Bieser is White, the prosecutor added: "Your Honor, may I also -- it is in the record already, but he also specifically said what doesn't equate to murder. And I talked to him about that. I didn't just talk to him about that topic. I talked to him about that as well and quoted him for saying that."

The trial court responded: "Yeah, he had his own opinions of what murder was. [¶] So, you know, based on everything that I heard, the court -- it comes down to the questioning. One, about the murder because he did say he had his own ideas about murder. And, two, the thing that was most concerning was his hesitancy about accepting testimony of training and experience. [¶] So the court believes that there is not a substantial likelihood that this was done because of race or ethnicity. So I will allow him -- I will allow him to be excused and I will deny the challenge."

14

## III.

### SECTION 231.7'S PROCEDURES AND THE GOVERNING STANDARD OF REVIEW

Section 231.7, subdivision (c) provides that if a party or the trial court objects to the use of a peremptory challenge on the ground it is used to remove a prospective juror on the basis of, inter alia, race under subdivision (a) of that code section, "the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised." (*Id.*, subd. (c).) Subdivision (d)(1) of that code section requires the trial court to then "evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances." The trial court is limited to considering "only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Id.*, subd. (d)(1).)

"If the court determines there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge, then the objection shall be sustained." (§ 231.7, subd. (d)(1).) The term "a substantial likelihood," for purposes of section 231.7, "means more than a mere possibility but less than a standard of more likely than not." (*Id.*, subd. (d)(2)(B).) Subdivision (d)(2)(A) of section 231.7 defines the term "an objectively reasonable person," as one who "is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California."

Section 231.7, subdivision (d)(3) provides a nonexhaustive list of circumstances the trial court may consider in making its determination. (See *Hinojos, supra*, 110 Cal.App.5th at p. 541.) As relevant here, the court may consider whether the objecting party, alleged victim, or witnesses are or are not members of the perceived cognizable group of which the prospective juror

15

belongs (§ 231.7, subd. (d)(3)(A)); whether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by that party as the reason for the challenge (*id.*, subd. (d)(3)(C)(i)); whether the party exercising the peremptory challenge engaged in cursory questioning of that potential juror (*id.* at subd. (d)(3)(C)(ii)); and "[w]hether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record" (*id.* at subd. (d)(3)(F)).

"On appeal, the overruling of an objection under section 231.7 is reviewed de novo 'with the trial court's express factual findings reviewed for substantial evidence.' (§ 231.7, subd. (j).) The appellate court is to consider only those reasons actually given by the trial court and may 'not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court.' [Citation.] If the appellate court concludes the trial court erred by overruling an objection, 'that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial.'" (*People v. Barnes* (2024) 107 Cal.App.5th 560, 578.)

IV.

THE TRIAL COURT ERRED BY OVERRULING BIESER'S SECTION 231.7 OBJECTION

As discussed *ante*, section 231.7, subdivision (d)(1) required the trial court to evaluate the reasons the prosecutor gave to justify her exercise of a peremptory challenge to excuse PJ No. 170 "in light of the totality of the circumstances." Here, the trial court evaluated those reasons and stated that "based on everything," its decision to overrule the objection "c[ame] down to the questioning. One, about the murder because he did say he had his own

16

ideas about murder. And, two, the thing that was most concerning was his hesitancy about accepting testimony of training and experience." There is insufficient evidence, however, to support each of the trial court's findings.

A. *The Record Does Not Support the Court's Finding PJ No. 170 Had His "Own Ideas About Murder"*

Before analyzing the sufficiency of the evidence of the court's finding that PJ No. 170 "sa[id] he had his own ideas about murder," we address an issue with the timing of the prosecutor's reliance on PJ No. 170's statements in that regard as a basis for the peremptory challenge. "Based on the plain meaning of the statute, a reason is 'actually given' under section 231.7, subdivision (d)(1), and thus the statute is satisfied, if the party exercising the challenge states the reason *before* the trial court rules on the objection, regardless that the party did not articulate the reason when initially stating its reasons upon the objection." (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 799–800 (italics added); see *id.* at p. 806 [additional reason given after hearing argument from opposing counsel and comments from court is suggestive of unlawful bias].)

Here, the prosecutor did not mention that PJ No. 170 "also specifically said what doesn't equate to murder"[3] until *after* the trial court stated it did not believe there was a substantial likelihood an objectively reasonable person would view race as a factor in the use of the peremptory challenge. Defense counsel did not have the opportunity to respond to that newly articulated basis for the peremptory challenge because after the

---

[3] The record shows in response to a question about what he thinks about an incident of drunk driving in which someone is killed, PJ No. 170 said such an event "doesn't necessarily equate to murder." Contrary to the prosecutor's statement, PJ No. 170 did not make a statement as to what does or does not equate to murder.

17

prosecutor's statement, the trial court immediately agreed, stating: "Yeah, he had his own opinions of what murder was." The court then cited that basis along with PJ No. 170's hesitance to accept testimony of training and experience in overruling the section 231.7 objection to the peremptory challenge. Arguably, in light of *People v. Ortiz, supra*, 96 Cal.App.5th at page 757, the prosecutor's additional ground was asserted too late to be considered by the trial court as one of "the reasons given to justify the peremptory challenge" under section 231.7, subdivision (d)(1) and on review by this court under section 231.7, subdivision (j).

In any event, this evidence is insufficient to support the court's finding PJ No. 170 said "he had his own ideas about murder." Our review of the record shows PJ No. 170 did not express any opinion as to what does or does not constitute murder. To the contrary, he stated simply because drunk driving was involved in an incident in which someone lost their life does not mean a murder necessarily occurred. PJ No. 170 thus expressed an openness regarding what constitutes murder.

He also expressly agreed such a determination would depend on the evidence presented to the jury and that he would be able to listen to the facts and apply it to the law.[4] Consequently, the court's finding in support of

_____

[4] Although not part of our analysis supporting reversal of the judgment in this matter, we observe that in contrast to PJ No. 170, the record shows during voir dire Prospective Juror No. 117 actually expressed opinions on the subject, stating: "Someone has to give me information that indicates that this particular case, for [Bieser], would not be something that would put her in the category of a murderer." When asked what he would be looking for, that juror said: "[I]f someone was drinking and driving fast and  -- quite honestly, you see it a lot these days. And had some crazy fiery crash, then -- then I would think that as the driver that caused the accident, it was very negligent and would be considered a murder." Prospective Juror No. 117 also

18

the peremptory challenge that PJ No. 170 had particular opinions/ideas about murder is unsupported by the record.

### B. Nor Does Our Record Show PJ No. 170 Was Hesitant About Accepting Testimony of Training and Experience

In explaining its decision to overrule the section 231.7 objection, the trial court also stated, "the thing that was most concerning was [PJ No. 170's] hesitancy about accepting testimony of training and experience." The prosecutor had argued: "[PJ No. 170] talked about . . . doing the job and looking at things not observable to others that might be in the evidence. [¶] And then when I talked to [PJ No. 170] today about whether he would consider the experience of a police officer, he was hesitant to do that. And talked about how he -- 'well, I don't know if I would agree with that, with his perceptions.'"

But the record does not show PJ No. 170 disagreed in principle or was otherwise reluctant to accept the general idea a witness's specialized experience can be considered in evaluating that witness's testimony or that he would otherwise inappropriately evaluate the evidence. PJ No. 170 stated he would potentially consider a police officer's experience and training in evaluating the officer's testimony. PJ No. 170 then explained whether he would do so depended on whether the officer's specialized experience or percipient observations was the subject of the officer's testimony. The prosecutor then clarified her question and asked PJ No. 170 whether he would consider an officer's experience in evaluating that officer's testimony in the event the officer was not testifying as a percipient witness but instead on a specific topic for which the officer had specialized experience. Without any

stated, "there is a much higher burden of proof on murder than there is on manslaughter, in my opinion."

19

hesitation or qualification discernable in our record, PJ No. 170 responded, "Yes."

Nevertheless, the trial court observed PJ No. 170 "did hesitate [that] morning" and stated, "[T]his is a case that involves expert opinions involving DUI. And when the question was asked, 'how would you regard training and experience,' he did hesitate and kind of hemmed and hawed about it until I think [counsel] asked him another question where he said, '[W]ell, I guess I could do it.' [¶] But there was kind of a long-winded answer about, you know, 'I don't know if I would be able to do that or whether if I would do that or not.'"

Our record does not show any hesitancy to consider and evaluate expert testimony on the part of PJ No. 170 during voir dire. The record does not show anything other than PJ No. 170 providing immediate, responsive answers to the prosecutor's questions. Consequently, the evidence does not support the trial court's finding on this point.

## C. Given the Totality of the Circumstances, There is a Substantial Likelihood an Objective Reasonable Person Would View Race As a Factor in the Instant Peremptory Challenge

As discussed *ante*, the reasons given by the prosecutor for exercising the peremptory challenge to excuse PJ No. 170 were "contrary to or unsupported by the record." (§ 231.7, subd. (d)(3)(F).) "The prosecutor's reliance on unsupported or unpersuasive reasons increases the likelihood [PJ No. 170]'s cognizable group membership factored into the challenge, especially from the perspective of an objectively reasonable person who 'is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors' in California (§ 231.7, subd. (d)(2)(A).)" (*People v. SanMiguel* (2024) 105 Cal.App.5th 880, 896–897

20

(conc. & dis. opn. of Cody, J.)), review granted Dec. 18, 2024 (S287786); see *Rice v. Collins* (2006) 546 U.S. 333, 343 (conc. opn. of Breyer, J.) ["prosecutor's inability in this case to provide a clear explanation of why she exercised her peremptory challenges may well reflect the more general fact that the exercise of a peremptory challenge can rest upon instinct not reason"]; Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge* (2005) 85 B.U. L. Rev. 155, 160–161 [automatic cognitive processes resulting from unconscious biases, including unintentional stereotypes, may result in lawyer's inability to completely or correctly provide reason for exercise of peremptory challenge]; Graffy et al., *First Twelve in the Box: Implicit Bias Driving the Peremptory Challenge to the Point of Extinction* (2024) 102 Or. L.Rev. 355, 373, 377–378 [cognitive process underlying implicit bias is "nearly automatic, reflexive, and involuntary," and when it is at play, a person may not know why they chose to strike particular juror].)

No other circumstance identified in section 231.7, subdivision (d)(3) counterbalances the effect of the unsubstantiated bases for exercising the peremptory challenge to excuse PJ No. 170. While Bieser, the objecting party, is White and the victim and his family members who were also witnesses to the incident are Hispanic, Bieser's partner, who was a witness at trial on Bieser's behalf, is also Hispanic. (See § 231.7, subd. (d)(3)(A)(i).) In addition, as pointed out by defense counsel, the prosecutor could have made a better record by pursuing questioning of PJ No. 170 that might have fleshed out any particular opinions about murder the juror might have held or any perceived hesitance or reluctance the prosecutor felt he had to consider an expert witness's experience and training in evaluating testimony at trial. (*Id.*, subd. (d)(3)(C)(iii).)

In applying the statute, we also must also consider the Legislature's stated intent that section 231.7 "be *broadly construed* to further the purpose of eliminating the use of group stereotypes and discrimination, whether based on conscious or unconscious bias, in the exercise of peremptory challenges." (Stats. 2020, ch. 318, § 1, subd. (c), italics added.) Given the Legislature's intent section 231.7 be broadly construed and the totality of the circumstances, including but not limited to the fact that neither of the prosecutor's stated reasons for exercising the peremptory challenge finds support in the record, we must conclude there is a substantial likelihood an objectively reasonable person would view PJ No. 170's race was a factor in the use of the peremptory challenge within the meaning of section 231.7, subdivision (d)(1). The trial court thus erred by concluding otherwise and in overruling Bieser's section 231.7 objection. Accordingly, and pursuant to subdivision (j) of section 231.7, the judgment must be reversed and the case remanded for a new trial.

*D. Section 231.7, Subdivision (g)*

For the first time on appeal, Bieser argues the prosecutor's challenge to PJ No. 170 rested on the juror's problematic demeanor and therefore was a presumptively invalid reason under subdivision (g)(1)(B) of section 231.7. That portion of the statute provides that "reasons for peremptory challenges [that] have historically been associated with improper discrimination in jury selection" include the prospective juror exhibiting "either a lack of rapport or problematic attitude, body language, or demeanor." (*Id.*, sub. (g)(1)(B).) Such reasons are "presumptively invalid" unless the trial court confirms the behavior occurred and the counsel offering the reason explains why the problematic behavior "matters to the case to be tried." (*Id.*, subd. (g)(2).) Our concurring colleague suggests Bieser's

22

conviction should be reversed not just under subdivision (d) but also on this additional, alternative demeanor ground. We disagree.

First and foremost, having concluded the conviction must be reversed under the section 231.7, subdivision (d) "totality of the circumstances" analysis, it is unnecessary to reach this alternative argument. Nevertheless, in light of the concurrence, we briefly address why section 231.7, subdivision (g) is not implicated here.

The record before us does not factually support a finding the prosecutor challenged PJ No. 170 because he exhibited a problematic demeanor. The prosecutor did not invoke the juror's demeanor (or any other section 231.7, subdivision (g) behavior) when she stated her reasons for challenging PJ No. 170. Consequently, the trial court's analysis focused on the "totality of the circumstances" required under subdivision (d)(1) of section 231.7. As we have explained *ante*, the transcript of the voir dire does not reflect that PJ No. 170 exhibited any kind of problematic demeanor.

Beginning with the plain meaning of the statute, we note "demeanor" means "behavior toward others" or "outward manner," (Merriam-Webster Unabridged Dict. Online (2025) <https://unabridged.merriam-webster.com/unabridged/demeanor, par.1> [as of May 15, 2025], archived at: <https://perma.cc/L7QK-KRD9>.) But, as indicated above, the voir dire transcript shows the prosecutor's challenge to PJ No. 170 had nothing to do with the *manner* in which he behaved during voir dire, the *manner* in which he responded to her questions, or any of his behavior toward others, including the prosecutor. The challenge was based on the *substance* of the juror's responses, including (1) the prosecutor's assertion PJ No. 170 expressed "his own ideas about murder" (which, as shown above, he did not); and (2) the prosecutor's assertion PJ No. 170 said he would look at "observable things

23

that are not in evidence" (which, again, he did not), and thereafter expressed reluctance (or, as she put it, "[H]esitanc[e]") to consider witnesses' experience in evaluating their testimony.

As noted above, the prosecutor's recollection and description of PJ No. 170's responses was largely not borne out by the transcript. But even if the prosecutor had perfectly recalled and recounted the substance of PJ No. 170's responses, it is clear her challenge was based on *what PJ No. 170 said* in response to her questions, not on *the manner in which he said it* or on any other aspect of his behavior. This might be because any suggestion the juror delivered his answers to the prosecutor haltingly, hesitantly, with hesitance, or in any way that could fairly be described as a "problematic . . . demeanor" (§ 231.7, subd. (g)(1)(B)) finds no support in the record. On the factual record here, no subdivision (g) analysis is warranted.

V.

WE DO NOT REACH BIESER'S REMAINING ARGUMENTS ON APPEAL

In addition to her argument the trial court erred by overruling her section 231.7 objection, Bieser raises additional contentions of trial error, including jury selection error, evidentiary error, instructional error, and prosecutorial misconduct. She argues these errors were prejudicial both individually and cumulatively. Because we reverse the judgment and remand for a new trial, we do not reach Bieser's other contentions of error. (See *People v. Dent* (2003) 30 Cal.4th 213, 222 [in capital case, because the judgment was reversed for *Faretta v. California* (1975) 422 U.S. 806 error and the matter remanded for a new trial, "it is unnecessary to reach defendant's other claims"]; *People v. Anderson* (2008) 169 Cal.App.4th 321, 331 ["[t]he general rule is that, following the reversal of a conviction, a defendant is entitled to have issues determined anew"].) We express no

24

opinion on these issues and leave it to the parties and the trial court to address them as necessary at the new trial on remand.

DISPOSITION

The judgment is reversed and the case is remanded for a new trial.


MOTOIKE, ACTING P. J.

I CONCUR:


GOODING, J.

DELANEY, J., Concurring and dissenting.

I agree with the majority's disposition of this case—reversal of the judgment and remand of the matter for a new trial. I write separately because I respectfully disagree with its analysis of the sole issue it addresses, as well as its decision not to address four additional issues of law, to which the parties devote hundreds of pages of briefing, that are bound to arise again on retrial. I also dissent from the majority's choice not to order publication of the decision in this case.

In my view, a careful and thorough review of the record shows the prosecutor expressly relied, in part, on an Hispanic prospective juror's demeanor during voir dire in exercising a peremptory challenge against him. That reliance triggers application of Code of Civil Procedure section 231.7, subdivision (g),[1] which makes presumptively invalid certain reasons that "have historically been associated with improper discrimination in jury selection." (*Id.*, subd. (g)(1).) Evaluating the circumstances thereunder leads to the conclusion the presumption was not overcome, meaning reversal of the judgment is required without even reaching the totality of the circumstances analysis under section 231.7, subdivision (d). Even assuming, arguendo, there were a need to reach the subdivision (d) analysis, which includes a focus on the prosecutor's "reasons actually given" for justifying the peremptory challenge (*id.*, subd. (j)), the outcome would be the same.

As for the four other claimed errors involving disputed issues of law, I find merit in one. However, because defendant Stefanie Lyn Bieser

_____

[1] All further statutory references are to the Code of Civil Procedure unless indicated otherwise.

1

fails to demonstrate prejudice with respect to that error, it does not provide a separate basis for reversing the judgment.

I.

JURY SELECTION

During jury selection, defense counsel objected to the prosecutor's exercise of a peremptory challenge to excuse Prospective Juror Number 170 (PJ170), arguing it violated section 231.7. Given the record in this case, the trial court's overruling of the objection was error because one of the prosecutor's asserted reasons for exercising the peremptory challenge was presumptively invalid under section 231.7, subdivision (g), and that presumption was not overcome. Even assuming, arguendo, that were not the case, the peremptory challenge fails scrutiny under section 231.7, subdivision (d)'s totality of the circumstances analysis.

*A. Section 231.7, Generally*

Section 231.7, subdivision (a), prohibits the use of "a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups."

The statue specifies the process that must be followed if a party or the trial court objects to the use of a peremptory challenge. First, "the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised." (§ 231.7, subd. (c).) Second, the trial court determines whether any of the provided reasons is presumptively invalid, and, if so, whether the presumption is overcome under the circumstances. (*Id.*, subds. (e) & (g).) Third, if there is no presumption of

2

invalidity or any presumption is overcome, the trial court "evaluate[s] the reasons given to justify the peremptory challenge in light of the totality of the circumstances. The court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Id.*, subd. (d)(1).) "If the court determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge, then the objection shall be sustained. The court need not find purposeful discrimination to sustain the objection." (*Ibid.*) The statute provides a nonexhaustive list of circumstances a trial court may consider in making its determination. (*Id.*, subd. (d)(3)(A) – (G).) When the trial court makes a ruling, it must "explain the reasons for its ruling on the record." (*Id.*, subd. (d)(1).)

Notably, the statute is aimed at both targeted and unconscious bias. In that regard, the statute explains "an objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California." (§ 231.7, subd. (d)(2)(A).)

On appeal, the overruling of an objection under section 231.7 is reviewed de novo, "with the trial court's express factual findings reviewed for substantial evidence." (*Id.*, subd. (j).) An appellate court may only consider those reasons given by the party exercising the peremptory challenge and those factual findings expressly made by the trial court. (*Ibid.*) In that vein, the statute prohibits speculation about reasons not given for "the party's

3

failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court." (*Ibid.*) If the appellate court concludes the trial court erred by overruling an objection, "that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Ibid.*)

B.  *Prosecutor's Stated Reasons*

The general nature of the prosecutor's reasons for challenging PJ170 were twofold. One, the prosecutor believed PJ170 would not factor a witness's training and experience into his evaluation of the witness's testimony, and he would instead evaluate testimony using skills he developed as a behavioral analyst. Two, the prosecutor said PJ170 "specifically said what doesn't equate to murder." Importantly, the prosecutor added the last reason after both sides submitted on the matter and the trial court began to explain its thoughts, but before the court articulated its final ruling.

C.  *Section 231.7, Subdivision (g)*

After the party exercising a peremptory challenge provides their reasons for the challenge, a court must first evaluate whether one or more reasons falls into a category deemed by the statute to be presumptively invalid. (§ 231.7, subds. (e) & (g).) If a reason is presumptively invalid, the court must follow the applicable process for determining whether the presumption is overcome. Failure to overcome the presumption requires the sustaining of the objection to the peremptory challenge, or the reversal of a judgment due to failure to do so, without ever reaching the totality of the circumstances analysis. Unlike the majority, I believe this is one of those cases.

4

1. Applicability of Section 231.7, Subdivision (g)

Section 231.7, subdivision (g) lists three categories of presumptively invalid reasons that "have historically been associated with improper discrimination in jury selection." (*Id.*, subd. (g)(1).) One category includes the following reasons: "[t]he prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor." (*Id.*, subd. (g)(1)(B).) Those reasons, like those listed in the other two categories of the same subdivision, are "presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or [those] of counsel for the objecting party." (*Id.*, subd. (g)(2).) "Even with that confirmation, the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (*Ibid.*)

Bieser contends the prosecutor's first reason for the peremptory challenge against PJ170 is presumptively invalid under subdivision (g) of section 231.7, because it concerns PJ170's demeanor—his hesitance when responding to the prosecutor's line of questions concerning use of a witness's training and experience to evaluate testimony. The Attorney General concedes hesitancy when answering questions during voir dire is part of a juror's demeanor (see *People v. Jones* (1998) 17 Cal.4th 279, 294–295), but offers two explanations for why subdivision (g) should not apply in this case. First, the Attorney General argues "the prosecutor did not cite [PJ170s] demeanor as the reason for her peremptory challenge," but instead provided a reason grounded in the substance of PJ170's answers and "his reluctance in accepting the law as it applies to jurors." Second, relying on *People v. Gonzalez* (2024) 104 Cal.App.5th 1 (*Gonzalez*), the Attorney General argues

5

the prosecutor's reference to PJ170's hesitance was simply to contextualize the non-demeanor based reason for exercising the peremptory challenge. While the majority agrees with the first explanation, I view both explanations as inconsistent with the appellate record.

The prosecutor's explanation shows the reason was demeanor based. At multiple points during the discussion with the trial court, the prosecutor expressed concern about whether PJ170 would consider the training and experience of a witness in evaluating testimony. Each time, for a total of five times, the prosecutor referenced PJ170's hesitation, making statements such as: "I talked about whether he would consider [the] experience of that person, and he hesitated and said he wouldn't"; and, "When I spoke to him today about whether or not he would consider experience and he hesitated, his hesitancy causes me pause and that's my reason."[2] And when asked to restate the reason for the peremptory challenge one last time, the prosecutor noted PJ170 was initially hesitant to take into account a witness's training and experience, recognized he then said he would, and indicated "[h]e didn't seem like he wanted to." The prosecutor's instinctive sense that PJ170 did not want to consider a witness's training and experience, despite PJ170's unequivocal express words to the contrary after the prosecutor provided clarification, underscores the prosecutor's reliance on PJ170's hesitant demeanor. Stated differently, the prosecutor voiced skepticism about PJ170's substantive answers precisely because of his accompanying demeanor. Whether PJ170 did, in fact, hesitate in answering

_____

[2] The last stated part of the prosecutor's explanation, which expressly links the prosecutor's reason to PJ170s alleged hesitancy, is nowhere to be found in the majority opinion.

6

questions is irrelevant to this aspect of a section 231.7, subdivision (g) analysis; the critical question is whether the prosecutor's articulated reason invoked demeanor. (*Id.*, subds. (g) & (j).)

The Attorney General's first alternative view of the record, presented in written briefing, argues "the prosecutor was not referencing a physical hesitation, but rather [PJ170's] apprehension when he said that he would 'potentially' consider a witness's training and experience." The majority implicitly hinges its reasoning on the same single word, "potentially." I am not persuaded. First, demeanor and hesitation are not limited to a person's physical behavior. (See *People v. Martinez* (2009) 47 Cal.4th 399, 431 [examples of demeanor include body language and unspoken pauses]; Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/hesitation, par. 2> [as of May 21, 2025] archived at: <https://perma.cc/9FXJ-XGMT> [defining "hesitation" to include "a pause or faltering of speech"].) Second, the charge under section 231.7 is to consider only the prosecutor's "reasons actually given" (*id.*, subd. (j)), and nowhere in the record does the prosecutor mention the word "potentially." Third, if demeanor played no role, any concern based on PJ170's arguably equivocal initial response would have been allayed by his unqualified "yes" response to the same question when asked moments later. This highlights the fact that such a view of the record does not account for the prosecutor's statement that it seemed like PJ170 did not want to consider a witness's training and experience.

Notably, the way in which the majority interprets the record to support its conclusion that the prosecutor did not rely on a presumptively invalid reason is entirely inconsistent with its express and implicit

7

interpretation of the record in its totality of the circumstances analysis under section 231.7, subdivision (d). In the latter, the majority states "the record does not show [PJ170] disagreed in principle or was otherwise reluctant to accept the general idea a witness's specialized experience can be considered in evaluating a witness's testimony." If the words articulated by PJ170, including the word "potentially," do not show reluctance in one context, those same words cannot be used elsewhere as evidencing a reluctance on which the prosecutor based her reason. The record must be interpreted consistently. Additionally, although the majority's section 231.7, subdivision (g) analysis finds the prosecutor's use of the word "hesitant" had nothing to do with the manner in which PJ170 responded, its totality of the circumstances analysis discussing the trial court's use of the same word emphasizes that "[t]he record does not show anything other than [PJ170] providing immediate, responsive answers." The focus on the way in which PJ170 responded is a tacit recognition that the discussion of hesitance concerned, at least in part, the manner in which PJ170 responded to questioning.

Implicitly acknowledging the record reasonably could be interpreted as the prosecutor referencing PJ170's demeanor, the Attorney General argued in the alternative at oral argument that the prosecutor's reference to PJ170's hesitant demeanor was simply "to contextualize" the nondemeanor based reason for exercising the peremptory challenge, namely the substance of PJ170's answers about a witness's training and experience. In making this argument, the Attorney General relied on *People v. SanMiguel* (2024) 105 Cal.App.5th 880, review granted December 18, 2024, S287786 (*SanMiguel*), and *Gonzalez, supra,* 104 Cal.App.5th 1.

8

Both *SanMiguel* and *Gonzalez* are distinguishable, and the record in this case shows the demeanor aspect of the prosecutor's reason was inextricably intertwined with any nondemeanor aspect.

In *SanMiguel*, the stated reasons for the prosecutor's use of a peremptory challenge included the prospective juror's lack of eye contact, inattentiveness, and body language which made him appear disengaged. (*SanMiguel, supra,* 105 Cal.App.5th at p. 890, rev. granted.) That the appellate court found section 231.7, subdivision (g) applicable under those circumstances is not surprising.[3] (§ 231.7, subd. (g)(1)(B) [listing as presumptively invalid reasons that "[t]he prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor"].) At the same time, *SanMiguel* is not helpful to determining what must be done when, as in this case, a single proffered reason has both demeanor and nondemeanor components. (*Wishnev v. The Northwestern Mutual Life Ins. Co.* (2019) 8 Cal.5th 199, 217 [decision does not stand for proposition not considered by court].)

While at first glance, *Gonzalez* appears closer to a mixed articulation, a more detailed review reveals it is fundamentally different than this case. There, voir dire consisted of a written questionnaire, as well as oral

---

[3] A partial dissent in *SanMiguel* disagreed with the majority's conclusions that (1) the record demonstrated the section 231.7, subdivision (g) presumption of invalidity was overcome, and (2) the trial court did not err in overruling defendant's objection to the exercise of the peremptory challenge. (*SanMiguel, supra,* 105 Cal.App.5th at pp. 894–897 (dis. opn. of Cody, J.), rev. granted.) The Supreme Court granted review to resolve whether "the trial court properly overrule defendant's . . . section 231.7 objection to the People's peremptory challenge of a prospective juror." (*People v. SanMiguel,* S287786, Supreme Ct. Mins., Dec. 18, 2024, p. 1502.)

questions from the trial court and counsel. (*Gonzalez, supra*, 104 Cal.App.5th at pp. 9–10.) From the start, the challenged juror indicated "he had 'experiences with a law enforcement officer which would prevent [him] from judging a law enforcement witness by the same standard as any other witness.'" (*Ibid*.) In response to follow-up questions from the court, he relayed his experiences and said they left him frustrated and bitter. (*Id*. at pp. 10–11.) He twice stated he did not know if his experiences with law enforcement would affect him as a juror and said he did not know if he could make a decision based on the law and the facts presented. (*Ibid*.) But, he also "answered 'yes' to a series of questions the court asked confirming [he] would listen to the evidence and 'be fair and impartial to both sides.'" (*Ibid*.)

After defense counsel objected to the prosecutor's exercise of a peremptory challenge against the juror, an African American, the court engaged in a section 231.7 analysis. (*Gonzalez, supra*, 104 Cal.App.5th at p. 11.) The prosecutor "asserted he challenged [the juror] because [the juror] 'specifically told [the] court he [was] not sure whether or not he [was] capable of being fair to law enforcement.'" (*Id*. at p. 12.) Among other things, the prosecutor noted the juror said his experiences with law enforcement made him bitter and frustrated, and he twice said he did not know if he could be fair to law enforcement. (*Id*. at pp. 11–12.) The prosecutor also mentioned the juror "'became visibly emotionally upset during his discussion to the point where . . . he had a hard time articulating—getting the words out of his mouth.'" (*Id*. at p. 11.) Although the experiences described by the juror occurred at least 20 years prior, the prosecutor explained it was "obvious" the juror still felt "a great deal of emotional angst" and he would not be able to put his negative experience aside. (*Id*. at pp. 11–12.) The trial court

10

ultimately overruled defense counsel's objection and excused the juror. (*Id.* at p. 12.)

On appeal, a primary focus was whether the prosecutor overcame the presumptive invalidity of its reason grounded in the juror's negative experience with law enforcement, an issue reviewed under section 231.7, subdivision (e). (*Gonzalez, supra*, 104 Cal.App.5th at pp. 16–18.) However, the defendant also argued the peremptory challenge needed to be reviewed under subdivision (g) of the same statute. (*Gonzalez*, at p. 18.) The appellate court disagreed, reasoning that "the prosecutor's comments on [the juror's] demeanor did not constitute an independent justification for his peremptory challenge but were intended to support his challenge on the ground that [the juror] expressed doubt about remaining impartial in light of his negative interactions with law enforcement." (*Ibid.*) It viewed the situation before it as a "challenge based on the *substance* of [the juror's] responses," and contrasted it with another case in which the articulated reason for a peremptory challenge "was the *manner* in which [the juror] responded (or failed to respond) to questions." (*Id.* at p. 19; see *People v. Ortiz* (2023) 96 Cal.App.5th 768, 801 (*Ortiz*) [reasons given by prosecutor included that juror was soft spoken, reluctant, easily confused, and unable to answer questions].)

Here, unlike in *Gonzalez*, the manner of responding to a certain line of questioning and the substance of the corresponding responses were part and parcel of a single reason given by the prosecutor for its challenge, with the manner (i.e. demeanor) being the lynchpin. When the prosecutor initially asked PJ170 whether he would consider, for example, a police officer's experience when evaluating their testimony, he said "[p]otentially." After he explained what he meant and affirmatively answered a few

11

clarifying questions, he responded, "[y]es," when the prosecutor again asked if he would consider a police officer's experience. Despite that unqualified substantive response, the prosecutor later argued to the court that "[h]e didn't seem like he wanted to." The explanation for that feeling came elsewhere, with the prosecutor underscoring PJ170's hesitation when answering the questions.

Put simply, this is not a situation, like in *Gonzalez*, where the prosecutor's reason was based on the content of an answer consistently provided by the juror at multiple points during the voir dire process. Rather, PJ170's hesitant demeanor led the prosecutor to doubt his substantive response, which, in turn, resulted in the prosecutor's belief that PJ170 would not follow the law in evaluating witness testimony. With the prosecutor's articulated reason being based on PJ170's demeanor, section 231.7, subdivision (g)'s presumption of invalidity is triggered, and the two-step analysis provided in that subdivision must be applied to determine whether the presumption was overcome. (*Id.*, subd. (g)(2).)

To the extent *Gonzalez* may be read to suggest that, in order to fall within the ambit of section 231.7, subdivision (g), one of the presumptively invalid reasons must be offered as an independent reason, and to the extent it appears the Attorney General urges this court to adopt that view, I do not believe that perspective is consistent with the letter or the purpose of the statute. The statute speaks of "reasons" and deems those set out in subdivision (g) to be presumptively invalid. Nowhere in the statutory language does it state or imply that a listed reason must be stand-alone to trigger a subdivision (g) analysis. (See *People v. Cornett* (2012) 53 Cal.4th

12

1261, 1265 [unless statutory language is ambiguous, plain language of statute controls interpretation of it].)

As for the purpose of the statute, the Legislature's express intent in enacting section 231.7 was to "put into place an effective procedure for eliminating the unfair exclusion of potential jurors based on race, ethnicity, [and other specific group membership or perceived membership]." (Stats. 2020, ch. 318, § 1(a).) It recognized intentional bias was not the sole problem and "many of the reasons routinely advanced to justify the exclusion of jurors from protected groups are in fact associated with stereotypes about those groups or otherwise based on unlawful discrimination." (Stats. 2020, ch. 318, § 1(b).) So, it chose to "designate[] several justifications as presumptively invalid," target both conscious and unconscious bias, and direct the statutory language "be broadly construed to further the purpose of eliminating the use of group stereotypes and discrimination . . . in the exercise of peremptory challenges." (Stats. 2020, ch. 318, § 1(c).)

Limiting application of section 231.7, subdivision (g) to situations in which demeanor or another matter listed in the subdivision is articulated as an independent reason would impede rather than further the expansive legislative purpose of the statute. Such an interpretation would be constrictive in nature, which is opposite of the directive that the language be broadly construed. Additionally, it would remove significant situations from the heightened scrutiny of subdivision (g). As the present case illustrates, reasons provided for exercising a peremptory challenge against a juror will often overlap. Demeanor or behavior, for example, might trigger a concern about a juror's substantive response. And, because the substance of a response is critical in the voir dire process, counsel may exercise a

13

peremptory challenge and identify the substantive concern as a reason. If the explanation provided reveals a juror's demeanor or behavior played some role, it only makes sense to first proceed with the subdivision (g) process before reaching the totality of the circumstances test under section 231.7, subdivision (d). The fundamental nature of a subdivision (g) reason as being "historically . . . associated with improper discrimination in jury selection" (*id.*, subd. (g)(1)) does not change when the reason is intertwined with another reason, and neither does the possibility of it being a result of unconscious bias. Stand-alone or not, going through the subdivision (g) process furthers the Legislature's goal of eliminating the impact of unconscious bias in the jury selection process.

2.  Analysis Under Section 231.7, Subdivision (g)

Faced with a reason that is presumptively invalid under section 231.7, subdivision (g), an appellate court must first look to whether the trial court confirmed the demeanor and whether the court's factual findings in that regard are supported by substantial evidence. (*Id.*, subd. (g)(2); *People v. Uriostegui* (2024) 101 Cal.App.5th 271, 280–281 (*Uriostegui*); *Ortiz, supra*, 96 Cal.App.5th at p. 801.)

In this case, before coming to its ultimate conclusion concerning Bieser's objection to the peremptory challenge, the court made various statements about PJ170's demeanor: "he did hesitate this morning"; "when the question was asked, 'how would you regard training and experience,' he did hesitate and kind of hemmed and hawed about it until I think [the prosecutor] asked him another question where he said, 'well, I guess I could do it'"; and "there was kind of a long-winded answer about . . . 'I don't know if I would be able to do that or whether if I would do that or not.'" But, as even

14

the majority agrees, the record does not support that PJ170 "hemmed and hawed" or that he gave a long-winded answer, let alone the type of answer articulated by the court. PJ170 gave one-word answers to all the prosecutor's questions except one. That one-sentence answer, which explained PJ170's belief that a witness's perception of events mattered, came in response to a "why" question and it was not equivocal. Rather, it highlighted that PJ170 possibly misunderstood the prosecutor's prior question about using a police officer's experience to evaluate their testimony or that the question was unclear. When two follow-up questions helped clarify that police officers do not typically witness crimes and, instead, investigate them after they have occurred, PJ170 confirmed without qualification or evidence of hesitation that he would consider a police officer's experience.

I recognize there may be aspects of a juror's demeanor that are readily observable by a trial court, but not captured in a cold transcript. (See *People v. Armstrong* (2019) 6 Cal.5th 735, 770 [trial court has opportunity to observe juror's demeanor which may never be revealed in appellate record].) Even assuming, arguendo, there may be circumstances in which some level of deference to a trial court's stated observations is proper (see, e.g., *Ortiz, supra*, 96 Cal.App.5th at p. 802 [deferring to trial court's observations of juror's soft-spoken nature, reluctance, and timidity because nothing in record called into question those observations]), this case presents a different scenario.

The trial court first noted that PJ170 was hesitant. However, in explaining that hesitancy, the court listed matters that would be, but are not, embodied in the transcript of the proceedings. Again, nothing in the record shows PJ170 "hemmed and hawed," gave a long-winded answer, or stated "I

15

guess I could to it" or anything similar, in reference to consideration of a witness's training and experience. Under these circumstances, I must conclude the trial court's factual finding regarding PJ170's demeanor is not supported by substantial evidence.

It bears noting that when subdivision (g) of section 231.7 applies, a trial court's confirmation of asserted behavior must be "based on the court's own observations or the observations of counsel for the objecting party." (*Id.*, subd. (g)(2).) Something more than the repeating of any conclusory statements offered by the party exercising the peremptory challenge is needed. And, ensuring observations relied upon are accurately memorialized in the written record will assist in appellate review. Getting a readback of relevant portions of the voir dire, as was suggested by the prosecutor in this case, and having the objecting party's counsel provide their perspective may greatly assist in achieving that end.

Given my conclusion on step one of the section 231.7, subdivision (g) analysis, I need not and, therefore, do not reach step two, which concerns the prosecutor's explanation of "why the asserted demeanor . . . matters to the case to be tried." (*Id.*, subd. (g)(2).) Because the trial court's findings concerning demeanor are not supported by substantial evidence, the presumed invalidity of the prosecutor's stated reason was not overcome, and the court erred in denying Bieser's section 231.7 objection. (See *People v. Caparotta* (2024) 103 Cal.App.5th 874, 890–891.) Accordingly, I would reverse the judgment and remand the matter for a new trial for this reason, without reaching the totality of the circumstances analysis under section 231.7, subdivision (d).

*D. Section 231.7, Subdivision (d)*

Even accepting, arguendo, the Attorney General's position that section 231.7, subdivision (g) does not apply under the circumstances, or the alternative assertion that the presumption of invalidity was properly overcome (*id.*, subd. (g)(2)), the exercise of the peremptory challenge against PJ170 cannot be saved on the record in this case. Although the majority reaches that conclusion, its analysis does not follow the statutorily prescribed evaluation process. Among other discrepancies, the majority focuses on the trial court's statements about PJ170, evaluating whether there is sufficient evidence to support them, rather than performing a de novo review focused on the prosecutor's "reasons actually given" "to justify the peremptory challenge." (*Id.*, subds. (d) & (j).) It also includes, though it says it does not rely on, a comparative analysis which section 231.7 expressly forbids. (*Id.*, subd. (j).) Because the process is critical and there presently is little case law applying the subdivision (d) totality of the circumstances analysis, I set forth here what I believe is the proper analysis in this case.

The prosecutor's first reason had two substance related components. One concerned PJ170's willingness, or unwillingness, to consider a witness's training and experience. The other concerned his use of skills acquired through his job to analyze testimony.

Starting with the latter, the prosecutor described PJ170's discussion of his work in various ways: "[h]e talked about yesterday doing the job and looking at things not observable to others that might be in the evidence"; "he talked yesterday about observable characteristics that might or might not be in evidence"; "he said, 'I would look at observable things that are not in evidence[,]' [¶] [a]nd that's the quote I have"; "he is going to be

17

using his job to analyze their behavior and assess the testimony instead of what the law says he should be considering."

But, neither the attempt at a direct quote nor the general gist of the prosecutor's stated recollection is consistent with the record. (§ 231.7, subd. (d)(3)(F).) PJ170 never said he would look at matters not in evidence or use his job skills to assess testimony instead of following the law with which he would be instructed. To the contrary, he stated he would view the evidence as factually as possible, evaluate the presented evidence under the law without any bias, and base his opinion on the facts, not his feelings. His statements about his work as a behavioral analyst confirmed that approach, with him noting in response to defense counsel questioning that his work was "based on what's observable and measurable" and stating he would apply the same approach as a juror.

Also noteworthy is the prosecutor's cursory questioning about PJ170's work. (§ 231.7, subd. (d)(3)(C)(ii).) Recalling that, during questioning by defense counsel, he mentioned using observations in his work, the prosecutor asked whether he used personal observations or whether he used "circumstantial evidence of direct observation," combined with experience. After PJ170 responded he used personal observations, training, experience, and education, the prosecutor immediately moved on to a line of questioning concerning a witness's training and experience. The prosecutor made no inquiry into whether or how he would use his work related skills while serving as a juror, including whether he would use those skills and disregard the law. Yet that was part of the very basis on which the prosecutor later rested the exercise of the peremptory challenge against him. (*Id.*, subd. (d)(3)(C)(i).)

18

Similar concerns pervade the training and experience aspect of the prosecutor's justification. In explaining this part of the reasoning, the prosecutor described PJ170's answers as follows: PJ170 was hesitant to consider the experience of a police officer; he talked about how he did not "know if [he] would agree . . . with [the officer's] perceptions"; "when I talked to him further, I forced him into saying he would look at it"; "I talked about whether he would consider experience of [a law enforcement officer], and he hesitated and said he wouldn't[,] [a]nd then he said, 'well, maybe I will[,] I would look at it'"; and, he said "'[w]ell, yes, I would [take into account their training,]' [but] [h]e didn't seem like he wanted to."

Whether focusing on the precise words or the essence conveyed, PJ170's answers were markedly different than described by the prosecutor. When initially asked whether he would consider, for example, a police officer's specialized experience when assessing testimony, PJ170 replied, "Potentially." This conveyed a possibility, not that he would surely decline to do so. And, responding to a follow-up question asking why he would not consider it, he explained that a police officer's "experience is one thing, but their perception of the event that[] took place is another." In other words, he believed a witness's actual observations of an event were important. Rather than exploring the meaning of PJ170's answer, the prosecutor chose to clarify that "most times police officers aren't witnessing a crime happening," rather "[t]hey come and they take reports." PJ170 agreed and then readily affirmed he would consider a police officer's experience in a particular topic when evaluating their testimony related to that topic.

To the extent something caused the prosecutor to believe PJ170 would not consider a witness's training and experience despite his express

statement to the contrary, that something, be it some part of the answer or a gut feeling, was never explored. (§ 231.7, subd. (d)(3)(C)(ii).) The prosecutor did not, for example, inquire whether he was sure about his last answer or ask what led him to shift from his initial "potentially" answer to "yes." Doing so would have further developed the record on the very point used as the partial basis for the peremptory challenge.

The prosecutor's second reason, that PJ170 "specifically said what doesn't equate to murder," is similarly problematic. The trial court agreed, "Yeah, [PJ170] had his own opinions of what murder was." But, the record does not support the prosecutor or the trial court's characterization of PJ170's answers.

During the beginning of voir dire, the jurors heard the general circumstances of the case, including that it involved alcohol, driving, and someone dying, the sole murder charge, and information about the presumption of innocence. Defense counsel then directed various questions to individual jurors to gauge their ability to be fair and impartial. When defense counsel asked PJ170 about his thoughts after hearing the circumstances and the charge, PJ170 responded, "It doesn't necessarily equate to murder, but it just depends on what evidence is brought forward to us." He then answered affirmatively when defense counsel inquired whether he would be able to listen and evaluate the evidence to make that determination. Later, the prosecutor directed one question to PJ170 on the topic, inquiring whether he could set aside any preconceived notion of murder he might have and apply the facts to the law. PJ170 answered, "Yes, ma'am."

In context, PJ170's answers all conveyed the same message: he would have to hear the evidence and the law before determining whether the

20

circumstances amounted to murder. He never said what does or does not equate to murder, and he never expressed having his own ideas about murder. Simply put, the factual underpinning of the prosecutor's second reason is not supported by the record. (See § 231.7, subd. (d)(3)(F) ["[w]hether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record"]; *People v. Smith* (2018) 4 Cal.5th 1134, 1157–1158 [offering of reasons for exercise of peremptory challenge which prove to be implausible or unsupported by facts may fatally impair credibility]; *People v. Arellano* (2016) 245 Cal.App.4th 1139, 1169 [serious questions about legitimacy of prosecutor's reasons for exercising peremptory challenge arise when record is objectively contrary to prosecutor's statements].)

Two additional considerations merit discussion. First, the prosecutor never questioned PJ170 about his substantive thoughts on murder. (See § 231.7, subd. (d)(3)(C)(i) ["whether the party . . . failed to question the prospective juror about the concerns later stated . . . as the reason for the peremptory challenge"].) Instead, the prosecutor's sole question on the topic was whether he could set aside any preconceived notion of murder that he might have to focus solely on the law and the facts, a question to which he unequivocally responded he could. Second, the prosecutor added the murder related reason after both parties submitted the matter to the trial court for its ruling and after the court started to explain its thoughts. Such timing gives the impression of an afterthought justification, which would lead a reasonable person to question whether, unconscious bias was at play. (See *Miller-El v. Dretke* (2005) 545 U.S. 231, 246 [late stated reason for exercising peremptory challenge was difficult to credit as something other than pretext

21

because it "reek[ed] of afterthought"]; *Ortiz, supra*, 96 Cal.App.5th at p. 801 [additional reason given after hearing argument from opposing counsel and comments from court is suggestive of unlawful bias].) That concern becomes heightened when viewed together with the unsupported nature of the late stated reason and the prosecutor's lack of questioning on the topic.

In sum, the record in this case evidences cursory questioning or a lack of questioning on all matters used by the prosecutor to justify the peremptory challenge, unsupported or contradicted statements about the challenged juror's voir dire answers relating to those matters, and a seemingly afterthought second reason provided by the prosecutor which lacks any support.

The prosecutor's attempt, but inability, to provide a clear, factually supported basis for exercising the peremptory challenge lends credence to the notion that the challenge rested upon instinct. (See *Rice v. Collins* (2006) 546 U.S. 333, 343 (conc. opn. of Breyer, J.) ["prosecutor's inability in this case to provide a clear explanation of why she exercised her peremptory challenges may well reflect the more general fact that the exercise of a peremptory challenge can rest upon instinct not reason"]; Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge* (2005) 85 B.U. L.Rev. 155, 160–161 [automatic cognitive processes resulting from unconscious biases, including unintentional stereotypes, may result in lawyer's inability to completely or correctly provide reason for exercise of peremptory challenge].) As Justice Thurgood Marshall posited almost four decades ago, and as subsequent research has confirmed, instinct is often where unconscious bias manifests. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 106 (conc. opn. of Marshall, J.) (*Batson*); Liu, *Implicit Bias, Structural*

*Bias, and Implications for Law and Policy* (2023) 25 U.Pa. J. Const. L. 1280, 1283 [defining implicit bias and explaining such biases arise from cognitive processes which occur automatically, uncontrollably, and outside realm of conscious awareness]; Graffy et al., *First Twelve in the Box: Implicit Bias Driving the Peremptory Challenge to the Point of Extinction* (2024) 102 Or. L.Rev. 355, 373, 377–378 [cognitive process underlying implicit bias is "nearly automatic, reflexive, and involuntary," and when it is at play, a person may not know why they chose to strike particular juror]; Agarwal, Sway: Unravelling Unconscious Bias (2020) pp. 27–42 [gut instinct and intuition is product of accumulation of knowledge from experiences, interactions, situations, and contexts, and shaped by unconscious biases and prejudices].)

On this record, viewing the circumstances as a whole, there is more than a mere possibility—i.e., a substantial likelihood—that an objectively reasonable person would view race or ethnicity as a factor in the use of the peremptory challenge to remove PJ170. (§ 231.7, subd. (d)(1)–(2).) This conclusion does not represent a finding of actual bias on the part of the prosecutor, whether conscious or unconscious. Such findings are not the charge of the courts under section 231.7. Rather, this determination serves as a cautionary tale of the sea change effectuated by the Legislature in its attempt to root out unconscious bias in the jury selection process.

With the statute's focus on "reasons actually given" by the party exercising a peremptory challenge, the need for express findings and reasoning by a trial court, the plethora of circumstances deemed presumptively invalid, the relatively low bar required to sustain an objection based on the totality of the circumstances, and a primarily de novo review on

23

appeal, the development of a clear and comprehensive record by the parties and the trial court is of paramount importance. While such a record does not guarantee an appellate court will agree with the overruling of a section 231.7 objection, it ensures a court will have before it the information necessary to fully understand the circumstances and make an appropriate determination. Gaps, inconsistencies, unexplored or limited exploration of topics, and the failure to memorialize matters in the record, among other things, leave uncertainties which, under the legislative scheme, serve to increase the likelihood of unconscious bias being viewed as a factor in the exercise of a peremptory challenge.

Because the trial court should have sustained Bieser's objection to the prosecutor's exercise of a peremptory challenge to excuse PJ170, I agree with the majority's conclusion that reversal of the judgment and remand for a new trial is required. (§ 231.7, subd. (j).)

II.

CONSIDERATION OF BIESER'S ADDITIONAL ARGUMENTS

In addition to the jury selection issue, Bieser raises claims of evidentiary and instructional error, as well as prosecutorial misconduct, matters to which the parties collectively devote roughly 200 pages of appellate briefing. Relying on inapposite case law, the majority chooses not to reach those additional matters, instead "leav[ing] it to the parties and the trial court to address them as necessary at the new trial on remand." I believe that decision runs counter to the duty of an appellate court and to the efficient administration of justice.

The complaint charged Bieser with a single count of murder, and the prosecutor pursued only one theory of murder at trial, namely implied

24

malice murder. The additional issues Bieser raises are, with one very small exception, all pure questions of law. They were hotly contested, briefed, argued, and decided in the trial court, and the parties have fully briefed them on appeal. And, if there is a retrial on remand, it almost certainly will be based on the same sole theory of implied malice murder.

Under these circumstances, the additional issues should be addressed, and I do so here.[4] (§ 43 ["In giving its decision, if a new trial be granted, the [appellate] court shall pass upon and determine all the questions of law involved in the case, presented upon such appeal, and necessary to the final determination of the case"]; see, e.g., *People v. MacPherson* (1970) 2 Cal.3d 109, 116 [reversing judgment and considering other contentions that may arise again on retrial]; *People v. Hamilton* (1969) 71 Cal.2d 176, 178 [same]; *People v. Ridley* (1965) 63 Cal.2d 671, 677 ["This issue may arise upon retrial, and it is therefore appropriate to consider it for purposes of guiding the trial court"]; *People v. Moore* (1970) 5 Cal.App.3d 486, 493 [considering other issues which may arise on retrial and declining to address ones "not likely to occur on any retrial"].)

### III.

### ADDITIONAL FACTS

The following summarizes testimony from most of those who testified at trial, including Bieser.

---

[4] I do not address Bieser's contention of jury selection error grounded in the less stringent *Batson/Wheeler* doctrine, as any retrial will involve a new jury selection process. (See *Batson, supra*, 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258; *Uriostegui, supra*, 101 Cal.App.5th at pp. 277–278 [comparing *Batson/Wheeler* inquiry with § 231.7 inquiry].)

*A. Before and During the Concert*

On the night in question, Bieser and her husband, A.J., went to a concert at the House of Blues with their daughter, T.B.[5] Instead of driving from their house in the City of Whittier, Bieser and A.J. originally planned to take a rideshare to the venue. Not having money for the rideshare, Bieser drove them to the concert and A.J. testified that he and Bieser understood T.B. would get them a rideshare back to their house afterward.

When Bieser and A.J. arrived at the venue, they met T.B. and her friend for dinner. Bieser drank two glasses of wine, had a shot of hard alcohol, and ate a salad during dinner.

Following dinner, the group moved to the concert portion of the venue and watched the opening band from an upstairs VIP area. T.B. bought Bieser a mixed drink, but it spilled. A.J. bought Bieser a glass of wine. When the next band came on, A.J. went downstairs to watch, while Bieser remained upstairs with T.B. and T.B.'s friend. According to A.J., Bieser's shoulder was hurting earlier in the evening. She told him it was starting to hurt again and she did not want to get hurt in the crowd. Prior to going downstairs, A.J. gave Bieser his wallet, phone and keys, and they agreed to meet by the exit gate after the concert. Shortly thereafter, T.B. and her friend went downstairs as well and they remained there for the duration of the concert.

---

[5] A.J. and Bieser were never legally married, but they have been together for multiple decades and Bieser refers to A.J. as her husband. They have children together and share children from prior relationships, including T.B.

When the concert ended, A.J. looked for Bieser at the exit gate. He did not see her there, so he went to where they had parked their car. The car was gone.

## B. *The Collision*

Before the concert ended, and after consuming more wine, Bieser left the venue by herself. A security guard testified she was holding a half-full cup of wine as she approached the exit and the security guard told her she needed to throw it away or finish it. Bieser handed the cup to the security guard and exited. She proceeded to the parking garage where her car was parked, got in the car, and left the structure.

Just before the collision, Louis Rosales was walking along the sidewalk on Disneyland Drive with his wife, R.R., his son, N.R., and his son's then fiancé, M.L.[6] Rosales and R.R. were roughly 30 to 50 feet ahead of N.R. and M.L. It was around 10:40 p.m., but there was still some pedestrian activity.

R.R. noticed Bieser's car come around the corner at a high rate of speed without slowing down. She noticed it was not staying on the street, so she turned to Rosales, who was walking a short distance behind her, and warned him to watch out. Moments later, she felt a force throw her into the nearby bushes. When she made her way out of the bushes, she saw Rosales lying on the ground.

Bieser's car also caught N.R.'s attention as it "jumped up onto the [street's] median . . . and then awkwardly and violently veer[ed] to the right

---

[6] Between the time of the incident and trial, N.R. and M.L got married, and M.L. changed her last name. I use her initials as they were at the time of the collision.

towards the sidewalk . . . where [his] parents were walking." According to N.R., the car was traveling at a high rate of speed for the area and its tires were screeching.

*C. Police Officer Testimony*

After attending to Rosales when he arrived on scene, a police officer helped Bieser from her car where she had remained seated since the impact. She was crying, stated she was not hurt, but mentioned having a pinched nerve. Bieser appeared unsteady as she walked, she smelled strongly of alcohol, and her eyes were watery and glassy.

The officer performed one field sobriety test before Bieser refused to participate in any others. While the officer performed the test and spoke with Bieser, Bieser displayed a wide range of emotions and behavior. Additionally, her words were sometimes slurred and "almost incoherent." The officer placed her under arrest. A blood draw performed pursuant to a warrant roughly five hours after the collision indicated a blood alcohol level of between 0.188 and 0.191. An Orange County Crime Lab director opined that at the time of the collision, Bieser's blood alcohol level may have been between 0.25 and 0.26.

A different officer testified about his observations of Bieser while at a police station following her arrest. He noted Bieser strongly smelled of alcohol. He performed various tests to help evaluate her level of impairment. Based on his training and experience, he concluded she was under the influence of alcohol to an extent that it would have impaired her ability to operate a vehicle safely.

Testimony related to the collision came from an Anaheim Police Department collision investigator. Based on training, experience, and

investigation, he described how he believed the accident occurred: Bieser made a right turn onto Disneyland Drive, but failed to properly negotiate the turn and the left wheels of her car impacted the center median; the car then accelerated across the lanes of traffic, striking and going up onto the curb; from there, it struck two utility boxes, skidded sideways along the sidewalk and came to rest after hitting Rosales and a couple of trees. The investigator could not determine the speed at which the car was traveling.

*D. Bieser's Background*

A human resources director for a restaurant chain where Bieser had been employed as a server testified about training Bieser completed as part of the hiring process roughly three years prior to the collision. Part of the training records indicated Bieser completed a "'service bar'" training which included topics such as bar computer skills, alcohol selling strategies, and policies concerning intoxicated guests. With respect to the latter, the training contained the following, among other things: a statement that it was illegal to serve alcohol to "a guest who is visibly intoxicated"; a list of a few signs of intoxication; and, what to do if a guest appeared to be intoxicated, including notifying a manager, stopping alcohol service to them, and "always offer[ing] to call them a cab."

Also related to Bieser's work for the same restaurant chain, a manager of the location where Bieser worked testified about an incident which occurred approximately six months prior to the collision. He relayed that other employees notified him Bieser may have been drinking before coming into work and was slurring her words. The manager spoke with Bieser who told him she had one beer at a party prior to coming to work. As documented in a written notice about the incident signed by Bieser, Bieser

29

was advised: she was not permitted to come to work after having alcohol; whether she was intoxicated or not, "the affect [sic] of alcohol was noticeable in her performance"; and any future suspicion of alcohol prior to work in the future would result in her termination. The notice further indicated she was in violation of, inter alia, a restaurant policy concerning "[n]egligent or improper conduct [which could] result[] in potential or actual harm or damage to teammates or guests, or which results in potential liability to [the restaurant]." The circumstances led the manager to believe it was unsafe for Bieser to remain at work; a family member picked her up.

### E.  Bieser's Testimony

Bieser testified about the events leading up to the collision, as well as circumstances from her past. Regarding the former, she said that prior to the concert, she had a pinched nerve in her shoulder that was hurting, so she took over-the-counter pain medication. She drove with A.J. to the concert venue, and she planned not to drink so that she could drive them home. During dinner, T.B. offered to get them a rideshare home, so Bieser decided to drink. She had two glasses of wine and a shot of hard alcohol, then the group went to watch the concert.

When A.J. went to the downstairs level, Bieser testified she chose not to go because of her hurting shoulder. After the rest of the group went downstairs, Bieser felt sharp pains in her shoulder. She was unsuccessful in finding any of the group, she tried calling T.B. ten times, and eventually decided to leave. She got in her car and shortly thereafter, when turning onto Disneyland Drive, Bieser said she had a pain in her arm, "lost control of the turn," hit the center divider, panicked and tried to regain control, and

pressed the gas instead of the brake. She did not realize she had hit someone until she was told later while at the police station.

As to the past, Bieser admitted to pleading guilty to driving under the influence (DUI) about 30 years before the collision, when she was 19 years old. She believed she completed some classes, but she did not remember the content. And regarding the work incident when she was sent home after appearing intoxicated, she said she had a drink at an adjacent restaurant before her shift, she had family issues that were making her very emotional at the time, and she got a ride from the restaurant to her grandmother's nearby house.

On cross-examination, Bieser confirmed she previously worked as a registration clerk who assisted with admitting people to a hospital. As part of the hiring process, she received the hospital's "Drug- and Alcohol-Free Workplace" policy. The policy defined, from the hospital's perspective, the terms alcohol and being under the influence, stated the hospital was committed "to provid[ing] an environment that is free of drug and alcohol abuse," and required employees to complete a drug screening test.

The prosecutor also elicited information about Bieser's prior DUI conviction and her general knowledge of the dangers of drinking and driving. Bieser acknowledged the prior DUI and said she believed she was ordered to complete a first offender DUI program, but denied any recollection of having completed a 16-week course for first offenders. And, although Bieser eventually answered in the affirmative when asked if, prior to the incident, she knew that driving under the influence of alcohol is dangerous to human life, she denied having talked to her children about the possibility of hurting or killing someone if they were to drink and drive. She said their

31

conversations focused on getting pulled over and arrested, losing your license, insurance premiums going up, and how costly it is overall.

IV.

ADMISSION OF EVIDENCE CONCERNING PRIOR EMPLOYMENT INCIDENT

Bieser argues the trial court erred in admitting evidence of the work related incident in which her restaurant manager reprimanded her after she arrived at work seemingly intoxicated. From her perspective, the evidence was inadmissible propensity evidence and, at the very least, should have been excluded pursuant to Evidence Code section 352. Because the evidence was relevant to the disputed subjective knowledge element of implied malice murder, the trial court did not err in admitting it.

A. *Applicable Law*

"Evidence Code section 1101, subdivision (a) prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. The provision 'expressly prohibits the use of an uncharged offense if the only theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' [Citation.] 'Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.] 'If an uncharged act is relevant to prove some fact other than propensity,' [such as knowledge,] . . . 'the evidence is admissible, subject to a limiting instruction upon request.'" (*People v. Chhoun* (2021) 11

32

Cal.5th 1, 25 (*Chhoun*); see also Evid. Code, § 1101, subd. (b) [listing knowledge as nonpropensity matter which may be established through evidence of prior act].)

"Even if evidence of the uncharged conduct is . . . relevant for a nonpropensity purpose, the trial court must next determine whether the evidence's probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*Chhoun, supra*, 11 Cal.5th at p. 26.) Because of the potential for great prejudice, due to its possible misuse by the jury, courts have fashioned heightened protections in this regard. "The proffered evidence must be relevant to an ultimate fact "'actually in dispute.'" [Citation.] Moreover, the probative value of defendant's past conduct must be substantial. [Citations.] 'If evidence is "merely cumulative with respect to other evidence which the People may use to prove the same issue" it is excluded under a rule of necessity. [Citations.] . . . If there is any doubt, the evidence should be excluded.'" (*People v. Dellinger* (1984) 163 Cal.App.3d 284, 297 (*Dellinger I*).)

An appellate court reviews the trial court's evidentiary decision for an abuse of discretion. (*Chhoun, supra*, 11 Cal.5th at p. 26.)

B. *Analysis*

The trial court first considered the admissibility of the prior work related incident in the context of pretrial motions. Defense counsel sought to exclude the evidence, arguing it was irrelevant to anything at issue and not admissible under Evidence Code section 1101. The prosecutor explained the supervisor who admonished Bieser would testify Bieser was slurring her words, he advised her coming to work after consuming alcohol would not be

33

tolerated, and Bieser was sent home without being allowed to drive. From the prosecutor's perspective, the testimony was relevant to Bieser's "subjective knowledge of the wrongfulness of her conduct in this case." The court believed the evidence was likely relevant and admissible to establish Bieser's knowledge, but it reserved on the issue pending further discussions.

During a later discussion outside the presence of the jury, the court ruled it would allow the proposed testimony for the limited purpose of proving the subjective knowledge element of implied malice, which it articulated as "knowledge that alcohol intoxication can be dangerous to safety." It clarified it was not admitting the evidence under Evidence Code section 1101, subdivision (b), because it found that section inapplicable, and it cautioned it would not allow the prosecution to argue "that because she drank then, she has been drinking all along[,] and it is inevitable that she would keep drinking and cause this accident."

Contrary to Bieser's assertion, the trial court did not err by admitting the identified testimony. The prosecution's theory of the case rested on implied malice murder, and one element of implied malice murder concerns the defendant's subjective mental state. Specifically, at issue was whether Bieser knew her conduct on the night of the collision endangered the life of another and whether she acted with a conscious disregard for life. (See *People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*) [confirming implied malice subjective component]; *People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson I*) [articulating implied malice standard]; see also *People v. Thornton* (2000) 85 Cal.App.4th 44, 48–49 [not guilty plea disputes all elements of charged].)

34

Her former manager's testimony about the work related incident was circumstantial evidence of her subjective knowledge and decision-making on the night of the collision. (*People v. Superior Court (Costa)* 183 Cal.App.4th 690, 697 [implied malice may be established through circumstantial evidence].) Bieser admitted to drinking before work. As part of the admonishment process, which included a written warning signed by Bieser, the manager told her the effect of alcohol was noticeable in her performance, her behavior could result in harm to other employees or guests, or could result in potential liability to the restaurant, and her actions disregarded the restaurant's safety regulations. And, rather than simply having her leave, the manager followed restaurant policy of requiring someone else pick her up. From this evidence, particularly when viewed in combination with other evidence about Bieser's past, one could reasonably infer she knew driving in an area frequented by pedestrians, after drinking at least five glasses of wine and a shot of hard alcohol, posed significant danger to others, including a danger to their lives. The evidence was also relevant to whether Bieser acted with a conscious disregard for life. (See *People v. Ortiz* (2003) 109 Cal.App.4th 104, 111–112 [persistence in drunk or reckless driving after having knowledge of its dangerous consequences may evidence a conscious disregard for lives of others].)

While it appears the trial court may have been mistaken in stating Evidence Code section 1101, subdivision (b) was irrelevant, its explanation and ultimate ruling was valid. The court said it would not allow the prosecution to use the evidence to effectively argue Bieser had a habit of drinking and it was inevitable she would cause an accident like the one which killed Rosales. The use disallowed by the court is of the type generally

35

proscribed by Evidence Code section 1101, subdivision (a). (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) In contrast, the court allowed use of the evidence to establish Bieser's knowledge. This is consistent with Evidence Code section 1101, subdivision (b), which clarifies the limited bounds of the prohibition detailed in subdivision (a). (*Ewoldt,* at p. 393.)

I likewise am not persuaded by Bieser's claim of error in the trial court's finding the evidence was more probative than prejudicial. In this context, "'""'prejudicial" is not synonymous with "damaging."'" [Citation.] "'"[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case."'" [Citation.] The "prejudice" which [Evidence Code] section 352 seeks to avoid is that which "'"uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'""" (*Chhoun, supra*, 11 Cal.5th at p. 29, italics omitted.)

Being an event which occurred just six months before the collision and which involved Bieser being confronted with alcohol related safety concerns and the manager's refusal to let her drive herself, the work incident was considerably probative of Bieser's knowledge of the dangers of drinking and driving. And, notwithstanding the lack of a limiting instruction due to no request for one (see *Chhoun, supra*, 11 Cal.5th at p. 25 [limiting instruction for Evid. Code, § 1101, subd. (b) evidence only required if requested]), any potential prejudice was curbed by the brevity of the manager's testimony and the relative nature of the incident he described. The details of what occurred at work were far less provocative than the details of the evening leading up to the collision that killed Rosales. (See *Ewoldt, supra*, 7 Cal.4th at p. 405 [relative inflammatory nature of uncharged acts and charged offense is relevant to weighing of potential prejudice].)

36

On this record, the court's decision was not arbitrary or capricious. For the same reasons, I find no merit to Bieser's related argument that the erroneous admission of evidence violated her state and federal due process rights. (See *People v. Johnson* (2015) 61 Cal.4th 734, 763 [no violation of due process generally when evidence properly admitted under state law]; *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920 [due process violation from admission of evidence occurs only if no permissible inferences may be drawn from it and it necessarily prevents fair trial].)

V.

EXCLUSION OF CHARACTER EVIDENCE

Another alleged evidentiary error Bieser raises concerns evidence of her good character. She argues the trial court erred by excluding, as irrelevant, testimony which would have demonstrated her caring nature. I agree.

Evidence Code section 1102 carves out an exception to the general inadmissibility of character evidence to prove conduct on a specific occasion. In relevant part, it provides that opinion or reputation evidence regarding a defendant's character or character trait is not made inadmissible by Evidence Code section 1101 if the evidence is "offered by the defendant to prove [their] conduct in conformity with such character or trait of character." (*Id.*, § 1102.) Notably, the character trait or the aspect of defendant's character to which the evidence relates must be relevant, meaning it must be inconsistent with the offense charged. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1305.)

Here, Bieser sought to introduce testimony from a prior coworker who observed Bieser's behavior at work at a hospital. According to defense

counsel, the witness would testify she observed Bieser helping patients and coworkers pay for things when they were not able to themselves. With patients, Bieser would sometimes pay a co-pay; with coworkers, she would sometimes buy food. Based on these observations, the witness believed Bieser cared about people.

Having a caring disposition toward people, including complete strangers, is inconsistent with deliberately performing an act knowing it endangers the life of another. With the latter going to the subjective knowledge and conscious disregard elements of implied malice murder (*Knoller, supra*, 41 Cal.4th at p. 143), both of which Bieser heavily contested, the proffered evidence met the minimal relevance bar. (See Evid. Code, § 210 [evidence is relevant if it has any tendency in reason to prove or disprove disputed fact of consequence]; *People v. Alvarez* (1996) 14 Cal.4th 155, 201 [when trial court bars introduction of evidence on relevance basis, appellate court reviews whether evidence is indeed irrelevant].) The trial court erred in excluding it on relevance grounds.

Although I find error, I do not find it to be a separate basis for reversal of the judgment because, on the record in this case, the error was harmless. There was significant evidence against Bieser concerning the subjective component of implied malice. Among the evidence was her prior DUI conviction and related class completion, her past employment training concerning alcohol, its effects on the body, and how to handle a restaurant guest who appears intoxicated, testimony concerning conversations she and her husband had with their kids about drinking and driving, and the initial plan Bieser agreed to on the night in question, which involved taking a rideshare home from the concert. Further, on cross-examination, Bieser

eventually admitted she was aware of the fatal risk involved in driving after consuming alcohol. On this record, prejudice is not established. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1311 [erroneous exclusion of evidence of defendant's good character is governed by standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson II*)].)

VI.

PROSECUTION'S CLOSING ARGUMENT

"'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' . . . 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was "'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'"'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1219 (*Rangel*).)

During rebuttal argument, the prosecutor stated: "[T]here is absolutely no requirement that she sit there that night and think about, 'okay. Well, before I put my key into the ignition, let me think about the DUI. Let me think about the . . . hospital training. Oh, you know, I disagree with what [the restaurant manager] thought about me when I came to work intoxicated.' [¶] None of that is required. [¶] . . . [¶] It is just that she knew all of those things before. Before she put the key in the ignition. Do you find that the defendant knew that drinking and driving was dangerous to human life? Do you think objectively that's dangerous to human life? Do you believe that she knew those things before she put the key in the ignition? That's it." The

39

trial court overruled a defense objection that the prosecutor's argument misstated the law.

Bieser contends the argument misstated the elements of implied malice because it told the jury the law did not require proof she thought about the dangerousness of her conduct before she drove. A review of the record leads me to conclude otherwise.

Looking at the prosecutor's statements in context, the prosecutor was discussing evidence of Bieser's subjective knowledge and responding to a portion of defense counsel's closing argument about the subjective mental state for implied malice. Defense counsel argued "the question is whether or not she thought in her head, 'hey, I'm going to, I know he is going to die. I know someone is going to die, but I am going to do it anyway,' and that's just not shown to you beyond a reasonable doubt." The prosecutor correctly pointed out that knowledge someone will, in fact, die is not the legal standard; rather, implied malice requires knowledge of a risk to life. (See *People v. Dellinger* (1989) 49 Cal.3d 1212, 1218–1219 (*Dellinger II*) [describing implied malice subjective awareness requirement]; *Watson I, supra*, 30 Cal.3d at p. 300 [implied malice involves act by person who knows their conduct "endangers the life of another"].)

Because the prosecutor's statement, viewed in context, correctly described the subjective knowledge component of implied malice murder, Bieser's contention of prosecutorial misconduct is without merit. (See *Rangel, supra*, 62 Cal.4th at p. 1221.)

## VII.

### IMPLIED MALICE MURDER JURY INSTRUCTION

The trial court instructed the jury with the then standard version of CALCRIM No. 520. In relevant part, it provided that Bieser had implied malice if: (1) "[s]he intentionally committed the act [which caused the death of another person]"; (2) "[t]he natural and probable consequences of the act were dangerous to human life"; (3) "[a]t the time she acted, she knew her act was dangerous to human life"; and (4) "[s]he deliberately acted with conscious disregard for human life."

In supplemental briefing, Bieser challenges the instruction on various fronts. First, she contends it misstated the objective component of implied malice murder, or, alternatively, the trial court abused its discretion in declining to instruct the jury with a related pinpoint instruction she requested. Second, she argues the subjective component of the instruction misstated the law. I find no merit in her contentions.[7]

### A. Standard of Review

An appellate court "'review[s] a claim of instructional error de novo. [Citation.] "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.'"' [Citation.] 'Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case. [Citation.] It also has a duty to refrain from giving incorrect instructions or instructions on

---

[7] Because I find no instructional error, Bieser's related constitutional due process and equal protection claims are unavailing.

principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues.'" (*People v. Morales* (2021) 69 Cal.App.5th 978, 990.)

B.  *Objective Component of Implied Malice Murder*

Bieser claims the instruction given to the jury misstated the objective component of implied malice murder. Specifically, relying on *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*), she argues the Supreme Court changed the law regarding the requisite objective risk to life that a jury must find. From her perspective, a defendant's act must now involve "a high degree of probability that it will result in death," which is different than simply being "dangerous to human life." Because I do not agree that *Reyes* changed the law in this regard, I find the trial court properly instructed the jury. Likewise, I reject Bieser's contention that the court abused its discretion in declining to give a related pinpoint instruction requested by defense counsel.

In *Knoller*, the Supreme Court explained the evolution of case law regarding the elements of implied malice murder and its impact on standard jury instructions. Because the statutory definition of implied malice "is far from clear in its meaning[,] . . . '[t]wo lines of decisions developed, reflecting judicial attempts "to translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply."'" (*Knoller, supra*, 41 Cal.4th at pp. 151–152.) One line of cases, originating from a concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470, 480 (*Thomas*), "stated that malice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.'" (*Knoller*, at p. 152.) The other line of cases, stemming from *People v. Phillips*

(1966) 64 Cal.2d 574, 587 (*Phillips*), articulated implied malice as arising "when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.""" (*Knoller*, at p. 152.)

The Supreme Court eventually clarified matters in *Watson I*, holding the *Thomas* and *Phillips* articulations were equivalent to one another. (*Watson I, supra*, 30 Cal.3d at p. 300.) Years later, the court expressed concern about juries having difficulty conceptualizing a "'wanton disregard for human life,'" so it stressed "[t]he better practice in the future [would be] to charge juries solely in the straightforward language of the 'conscious disregard for human life' definition of implied malice." (*Dellinger II, supra*, 49 Cal.3d at p. 1221.) Thereafter, the standard jury instructions utilized the dangerous to human life language from the *Phillips* line of cases, and the Supreme Court reiterated that the two lines of cases articulated the same standard. (See *In re Farrell* (2023) 14 Cal.5th 593, 600; *Knoller, supra*, 41 Cal.4th at p. 152; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104 (*Nieto Benitez*).)

In *Reyes*, a murder resentencing case involving Penal Code section 1172.6, one issue before the Supreme Court was whether the trial court properly found the defendant's act of traveling into rival gang territory with gang members, one of whom was armed, was dangerous to human life. (*Reyes, supra*, 14 Cal.5th at p. 989.) Quoting *Knoller*, it once again reiterated that "[m]urder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who

43

knows that his conduct endangers the life of another and who acts with conscious disregard for life.""'" (*Reyes,* at p. 988.) Also quoting *Knoller*, it restated that dangerous to human life means the act "must '"involve[] a high degree of probability that it will result in death."'" (*Reyes,* at p. 989.) In support of the latter, it cited *Knoller's* recognition that the dangerous to life phraseology is the same as saying a high degree of probability the act will result in death. (*Reyes,* at p. 989.)

Because *Reyes* did not change the law on the relevant point, rather it restated it, the trial court did not misstate the law in this case when it instructed the jury with the objective dangerous to life component of implied malice murder. (*Nieto Benitez, supra*, 4 Cal.4th at p. 111 [concluding implied malice jury instruction including dangerous to life language as part of objective component did not misstate law].)

Recognizing this court might disagree with her first argument, Bieser alternatively challenges the trial court's decision not to add the following language to the implied malice instruction: "To find that the natural and probable consequences of the defendant's acts were dangerous to human life, the prosecution must prove that there was a high probability that the defendant's act would result in death. Serious bodily injury or harm is not enough." (Boldface omitted.) The trial court reasoned this language would likely confuse the jury. Bieser claims she was entitled to the pinpoint instruction because it correctly stated the law, was supported by substantial evidence, was not argumentative, duplicative, or potentially confusing, and was necessary for the jury to understand the legal principles related to the evidence. From the Attorney General's perspective, the court acted properly

because the proposed language "did not pinpoint the theory of the defense and was otherwise duplicative."

Pinpoint instructions "'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case.'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) Separate from a trial court's duty to instruct on general principles of law closely and openly connected to the facts, "'"a defendant has a right to an instruction that pinpoints the theory of the defense . . . ."'" [Citation.] The court, however, 'may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].'" (*People v. Bivert* (2011) 52 Cal.4th 96, 120 (*Bivert*).)

Although I agree with Bieser that her offered language correctly stated the law and was not argumentative, I agree with the Attorney General it was duplicative. As explained above, extensive Supreme Court case law recognizes the "high probability" language and the "dangerous to human life language" are synonymous. Including both would effectively be saying the same thing twice. Because the instruction given already fully and adequately advised the jury on the objective component of implied malice, the trial court did not err by refusing a pinpoint instruction on that point. (See *Bivert, supra*, 52 Cal.4th at p. 120; *People v. Canizalez* (2011) 197 Cal.App.4th 832, 857.)

*C. Subjective Component of Implied Malice Murder*

Bieser's last instruction related contention concerns the subjective knowledge aspect of implied malice murder. She argues the trial court erred in refusing to add the following additional language to the

45

instruction given: "The prosecution must prove beyond a reasonable doubt that a defendant subjectively knew that his conduct carried a high probability of death." (Boldface omitted.) In making this argument, Bieser acknowledges this court is bound by authority which requires reaching the opposite conclusion.

In *Knoller*, faced with determining whether the trial court properly articulated the subjective knowledge element of implied malice in evaluating a new trial motion, the Supreme Court explained the "high probability of death" language concerns the objective component of implied malice, not the subjective component. (*Knoller, supra*, 41 Cal.4th at p. 157, italics omitted.) This court is bound by that determination, which compels me to conclude the trial court did not err in refusing Bieser's subjective knowledge pinpoint instruction.[8]

## VIII.

### PUBLICATION

I dissent from the majority's choice not to order the decision in this case published.

The primary function of an appellate court is to ensure the law is interpreted and applied correctly. Part of that responsibility involves defining the bounds and contours of the law through decision-making, which, in turn, provides guidance to trial courts, litigants, and their counsel. In that vein, California Rules of Court, rule 8.1105 specifies circumstances in which an appellate court opinion "should be certified for publication." Among them are

---

[8] Because the jury selection error requires automatic reversal, and because I identify only one other error, I find no merit in Bieser's claim of cumulative error based on the trial court's non-jury selection related rulings.

the following: the opinion "explains . . . an existing rule of law"; it "applies an existing rule of law to a set of facts significantly different from those stated in published opinions"; it "[i]nvolves a legal issue of continuing public interest"; or it "[i]s accompanied by a separate opinion concurring or dissenting on a legal issue, and publication of the majority and separate opinions would make a significant contribution to the development of the law."

At minimum, the jury selection related issue in this case is publication worthy. Section 231.7 is a relatively new statute which institutes a dramatic shift in the way peremptory challenges are reviewed by courts at all levels. It took effect with respect to all criminal jury trials in January 2022, and its application will extend to all civil jury trials at the start of next year. (See Stats. 2020, ch. 318, §§ 2–3.) To date, there are less than one dozen published cases containing some type of a section 231.7 analysis, and only a few of those cases involve subdivision (g) or subdivision (d) of that statute in some manner.

With such a new, broadly applicable, and procedurally complex statute, the goal of which is to eliminate the impact of conscious and unconscious bias in the exercise of peremptory challenges, the current scarcity of case law applying it, and the disagreement among my colleagues and I about its application under the circumstances, this is a prime example of a case that should be published.


DELANEY, J.


47